UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                                               :
PHILLIP MICHAEL SCOTT,                                         :
                                                               :
                                                               :
                                  Plaintiff,                   :         1:17-cv-1052-GHW
                                                               :
                                                               :
              -v-                                              :     MEMORANDUM OPINION
                                                               :          AND ORDER
AIG PROPERTY CASUALTY COMPANY                                  :
AND GREAT NORTHERN INSURANCE                                   :
COMPANY,                                                       :
                                                               :
                                  Defendants.                  :
                                                               :
-------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/30/19

GREGORY H. WOODS, United States District Judge:

In the early morning of January 1, 2015, Plaintiff's home in Scarsdale, NY went up in flames. With it—Plaintiff claims—went the prototype of his "El Hydro" system, a device that uses hydrogen, extracted from water, to greatly increase the efficiency of internal combustion engines, and which was the subject of a recent $300 million contract. So too went over a million dollars of Plaintiff's personal property, which he says comprised—among other things—hundreds of thousands of dollars' of artwork (including "maybe a Picasso") and an extensive collection of precious stones.

When Defendants—who each issued a homeowner's insurance policy on Plaintiff's home just weeks before the fire occurred—investigated Plaintiff's claims, they found that Plaintiff had recently lost a protracted legal battle over the foreclosure of his home, had received a discharge in bankruptcy a mere thirteen months before the fire, and was largely unable to provide any corroboration for his claim that he was a wealthy entrepreneur with extensive personal property. Defendants denied Plaintiff coverage, citing both the provisions of their policies which prohibit "fraud and concealment" in the submission and investigation of a claim, as well as the provisions

requiring that Plaintiff cooperate with the insurers' investigations. Plaintiff then filed this action, claiming that Defendants had breached their contracts by failing to pay his claim. Defendants moved for summary judgment on the ground that Plaintiff's coverage under the policies had been voided. For the reasons that follow, Defendants' motion for summary judgment is GRANTED.

## I.   BACKGROUND

The Court views the facts in the light most favorable to the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Unless otherwise indicated, the following facts are undisputed.[1]

### a.   The Purchase and Foreclosure of 12 Inverness Road

This legal saga began innocuously in June 2005, when Plaintiff—along with two other buyers[2]—purchased a residence at 12 Inverness Road in Scarsdale, New York ("12 Inverness") for $725,000. Plaintiff's Responses to Defendants' Joint Statement of Material Facts, Dkt. No. 93 ("56.1 Stmt."), at ¶ 1. The sale was financed by a mortgage loan in the same amount, which was eventually assigned to The Bank of New York Trust Co., N.A. (the "Mortgagee Bank"). *Id.* at ¶ 12. The following year, on April 2, 2006, 12 Inverness was damaged by a fire determined to be electrical in origin.[3] *Id.* at ¶ 63. Afterwards, Plaintiff embarked on a total renovation and rebuild of 12

---

[1] The Court notes that the original exhibits attached to the Declaration of Eric D. Freed, Dkt. No. 89, appeared to be missing various pages. As a result, in his Responses to Defendants' Joint Statement of Material Facts, Dkt. No. 93, Plaintiff repeatedly denied various factual assertions because the pages of the exhibits purporting to support those factual assertions had not been provided. As discussed during the September 21, 2018 telephone conference with the Court, Plaintiff had access to these missing pages at the time he filed his opposition papers. The Court has independently examined the amended exhibits provided by Defendants, and, to the extent that those exhibits support the statements of fact included in Defendants' Rule 56.1 statement, any fact denied by Plaintiff *solely* on the basis that the appropriate pages of the exhibit were not filed with the Court as part of Defendants' initial submissions has been deemed admitted.

[2] Both co-purchasers, Marlene Langley and Barbara Campbell, eventually transferred their interest in 12 Inverness to Plaintiff by quitclaim deed in September 2013. 56.1 Stmt. at ¶¶ 1, 16.

[3] Plaintiff admits that he submitted a claim to his then-insurer in relation to the 2006 fire and that the insurer paid over $300,000 for the loss, but he denies receiving any of this money. 56.1 Stmt. at ¶¶ 63-64, 88.

Inverness, with the goal of converting it from a single-story ranch house into a two-story colonial. *Id.* at ¶ 64.

In April 2007, Plaintiff and his co-borrowers defaulted on the mortgage for 12 Inverness. *Id.* at ¶ 20; Declaration of Eric D. Freed, Dkt. No. 89 ("Freed Decl."), Ex. 9 at 14:17-24. Accordingly, the Mortgagee Bank initiated foreclosure proceedings in the Supreme Court of the State of New York, Westchester County in 2008 and obtained a judgment of foreclosure and sale on March 25, 2009.[4] 56.1 Stmt. at ¶¶ 25-26. Over the next several years, Plaintiff repeatedly attempted to vacate the judgment of foreclosure.[5] *Id.* at ¶¶ 27-29. Those attempts culminated in an order issued on March 28, 2012, in which Judge Mary H. Smith of the Westchester County Supreme Court warned Plaintiff that any future motions seeking similar relief would be deemed frivolous and could warrant the imposition of sanctions. *Id.* at ¶ 29; Freed Decl., Ex. 77 at 3 ("The inescapable fact is that this mortgage has not been paid since May 1, 2007 . . . [and] there simply exists no reason in law or equity for this action to not forthwith proceed to its logical conclusion.").

After Plaintiff engaged in several more unsuccessful attempts to forestall the foreclosure sale,[6] the court scheduled a public auction of 12 Inverness for May 6, 2013. 56.1 Stmt. at ¶ 49. On

---

[4] This action was actually the third foreclosure action initiated by the Mortgagee Bank. The first, filed on April 7, 2006, proceeded to judgment, but the judgment was then vacated when Plaintiff and the other co-owners of 12 Inverness paid $109,764.37 to bring the loan current. 56.1 Stmt. at ¶ 23. The second foreclosure action was filed on June 5, 2008, but was voluntarily discontinued on August 11, 2008, after the filing of the third foreclosure action. *Id.* at ¶ 24.

[5] In addition to various filings in state court, Plaintiff also unsuccessfully attempted to remove the third foreclosure action to federal court and filed two separate federal court actions in the Southern District of New York seeking to vacate the foreclosure judgment. 56.1 Stmt. at ¶¶ 42-43. Plaintiff's federal cases were both dismissed by the Honorable Cathy Seibel on July 18, 2012 and August 13, 2012, respectively. *Id.* at ¶ 43.

[6] Those attempts included a motion to recuse Judge Smith and an unperfected appeal of the denial of that motion and Judge Smith's March 28, 2012 order. 56.1 Stmt. at ¶¶ 31-32. On May 2, 2013, the Westchester court entered an order prohibiting Plaintiff from filing any additional documents attempting to vacate the foreclosure judgment. *Id.* at ¶ 33. After the court issued its May 2, 2013 order, Plaintiff commenced a separate action in Westchester County Supreme Court, seeking to vacate the foreclosure judgment. *Id.* That action was subsequently dismissed when Plaintiff moved for default judgment and the court determined that there was no evidence that the summons had been served on the Mortgagee Bank. *Id.*

3

May 3, 2013—three days before the auction—Plaintiff filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Southern District of New York, for the explicit purpose of "get[ting] at the bank," "strip[ping] off" what he viewed as the "illegal" judgment in favor of the Mortgagee Bank, and staying the foreclosure proceedings. *Id.* at ¶¶ 50-51. After the sale of 12 Inverness was cancelled, Plaintiff withdrew his bankruptcy petition on May 6, 2013—the same day for which the auction had been scheduled. *Id.* at ¶ 51.

Shortly thereafter, in July 2013, a suspicious motion was filed in the Westchester County foreclosure action—purportedly by counsel for the Mortgagee Bank—which stated that the bank had voluntarily elected to discontinue the action. *Id.* at ¶¶ 34-35. However, soon after, the Mortgagee Bank attorney who supposedly filed this motion indicated in a sworn affirmation that the motion was "an unauthorized forgery," and that her signature and those of other employees at her firm had been "forged/traced/affixed to the Vacatur Motion from other documents filed in this and/or other related proceedings." *Id.* at ¶ 37. Before any substantive inquiry could be conducted as to the origins of this apparently fraudulent filing, Plaintiff filed a second bankruptcy petition *pro se* on August 22, 2013, which once again stayed the state court foreclosure proceedings. *Id.* at ¶¶ 38, 52, 185.

In filings related to this second bankruptcy petition, Plaintiff indicated that his monthly income was zero, that "no increase or decrease" of his income was expected, and that he was not in possession of any property that belonged to others. *Id.* at ¶¶ 189, 192-93. He provided a detailed list of his claimed $13,000 in personal property—which included $2,700 worth of clothing and $1,600 in tools and lawn equipment. *Id.* at ¶¶ 187, 188. Plaintiff's "Summary of Schedules" also ascribed a "current value" of $525,000 to 12 Inverness. *Id.* at ¶ 186. That $525,000 valuation corresponded with the figure provided in a detailed appraisal conducted by Mr. George Charles, the owner of Epidamy Appraisals, in September 2013, which revealed that the renovation of the home

was still very much a work in progress.[7]  *Id.* at ¶¶ 148, 150-55.  The appraiser noted in his September

2013 report that "[t]he entire property was incomplete except for one bedroom which was occupied

by the owner," and later testified that although homes in the area typically started out at around $1

million, 12 Inverness was valued at half that amount because "it was frame and inside was just like

two by fours" and "needed everything," with an estimated "cost to cure" of $880,000.  *Id.* at ¶¶ 151-

53.  This assessment is corroborated by color photos attached to the appraisal.  *Id.* at ¶¶ 154-55;

Freed Decl., Ex. 60.[8]

On November 8, 2013, attorney Kim D'Souza entered an appearance on behalf of Plaintiff

in the August 2013 bankruptcy action.  56.1 Stmt. at ¶¶ 53, 196.  On December 8 and December 11,

2013, Mr. D'Souza filed new versions of several of the schedules that were originally filed by

Plaintiff on August 22, 2013.  *Id.* at ¶¶ 54, 196.  Those schedules repeated virtually all the

information that Plaintiff had included in his August 22, 2013 filing, including the representation

that 12 Inverness had a current value of $525,000, that Plaintiff's personal property was worth a

total of $13,000, that Plaintiff had zero income, and that Plaintiff was not in possession of any

property belonging to others.  *Id.* at ¶¶ 197-98.  Based on Plaintiff's representations, the bankruptcy

court granted Plaintiff a discharge on December 18, 2013.  *Id.* at ¶ 55.

Mr. D'Souza's December 2013 filings also included a motion requesting that the Mortgagee

Bank's lien on 12 Inverness be avoided.  *Id.* at ¶¶ 56, 200.  Plaintiff's motion to avoid the Mortgagee

Bank's lien remained pending for almost a year, until the bankruptcy court issued a ruling on

October 30, 2014.  *Id.* at ¶¶ 57, 202; Freed Decl., Ex. 24.  Finding that it lacked jurisdiction to

---

[7]  It is not apparent from the parties' submissions how Plaintiff was able to describe the value of 12 Inverness as $525,000 in his August 22, 2013 bankruptcy filings, as the appraisal of the property was not conducted until September 2013.  *See* 56.1 Stmt. ¶¶ 149, 157.

[8]  A few weeks before Plaintiff hired Mr. Charles to conduct this appraisal, Plaintiff also obtained a "brokers price opinion" from a different appraiser, Abraham Mathew, that valued 12 Inverness at $2.85 to $3 million. 56.1 Stmt. at ¶ 204.

provide the requested relief, the bankruptcy court denied Plaintiff's motion, thereby leaving the

March 2009 judgment of foreclosure and sale undisturbed.  56.1 Stmt. at ¶¶ 57, 202; Freed Decl.,

Ex. 24.

### b. Plaintiff's Acquisition of Two Homeowners Insurance Policies from Defendants

After the 2006 fire at 12 Inverness, Plaintiff's homeowner's insurance policy was cancelled

and the property remained uninsured during the ensuing years until, in late 2014, Plaintiff obtained

the two homeowner's insurance policies at issue in this action.  56.1 Stmt. at ¶ 88.

On October 30, 2014—the same day that the bankruptcy court denied Plaintiff's request to

extinguish the Mortgagee Bank's lien on 12 Inverness—Plaintiff spoke to a representative of

GEICO Insurance Agency ("GEICO") about obtaining insurance to cover 12 Inverness.  *Id.* at

¶ 119.  GEICO writes insurance through multiple carriers and acts as an agent for Defendant AIG

Property Casualty Insurance Company ("AIG"), selling policies directly to customers using the AIG

underwriting guidelines, platform, and rates.  *Id.*  GEICO determines coverage limits based on

information provided by prospective customers.  *Id.* at ¶ 121.  Based on the information Plaintiff

provided, GEICO calculated the replacement cost of 12 Inverness as $1.9 million.  *Id.* at ¶ 122.

After another conversation with Plaintiff, GEICO issued AIG policy #0016741768, which provided

$2.5 million in coverage for Plaintiff's home and $1.25 million for its contents, with an effective date

of November 7, 2014.  *Id.* at ¶¶ 123, 124.

Eleven days later, on November 10, 2014, Plaintiff contacted Richard Signorelli, the owner

of AZBY Insurance Agency in the Bronx, through whom he had previously obtained auto

insurance.  *Id.* at ¶ 93.  Plaintiff informed Mr. Signorelli that he had just completed building or

renovating an 8,000 square foot single family home at 12 Inverness and that he was ready to insure

the home.  *Id.* at ¶ 94.  Mr. Signorelli proceeded to fill out an insurance application form using

information provided by Plaintiff, who was present at Mr. Signorelli's office while the form was

completed. *Id.* at ¶ 103.  One of the questions on the form was "[h]as applicant had a foreclosure,

repossession, bankruptcy, judgment or lien during the past five years?" to which Plaintiff answered

"[n]o." *Id.* at ¶ 104.  Plaintiff applied for building coverage in the amount of $2 million and contents

coverage of $500,000.  *Id.* at ¶ 106.  Mr. Signorelli testified that he had determined $500,000 to be an

adequate amount of contents coverage based on Plaintiff's indication that, although he was living in

the home, he was still getting settled and didn't "have much personal furnishings in the house yet."

*Id.*  After reviewing the application form, Plaintiff signed it in Mr. Signorelli's presence on

November 29, 2014.  *Id.* at ¶ 107.[9]

Thereafter, Plaintiff's insurance application form was submitted to Defendant Great

Northern Insurance Company ("Great Northern"), which indicated that it would insure 12

Inverness if Plaintiff provided a central station alarm certificate.  *Id.* at ¶¶ 109-11.  Plaintiff gave a

certificate to Mr. Signorelli showing that a central station burglar and fire alarm had been installed in

12 Inverness by ADT, and Great Northern issued a policy that became effective on December 8,

2014.  *Id.*  The policy provided dwelling coverage of $2 million, contents coverage of $1 million, and

$400,000 of coverage for "[o]ther permanent structures."  *Id.* at ¶ 112.  Mr. Signorelli informed

Plaintiff that although Great Northern would require an inspection of the property in the next four

to six weeks, the coverage was bound effective December 8, 2014.  *Id.* at ¶¶ 113-14, 116.  Knowing

---

[9]  Mr. Signorelli also testified at his 2018 deposition that during his initial discussions with Plaintiff, he
informed Plaintiff that a certificate of occupancy was required to obtain insurance, and that Plaintiff
represented that he did have a certificate of occupancy.  56.1 Stmt. at ¶ 94.  However, in January 2015,
Plaintiff told an investigator for Great Northern that he did not in fact have a certificate of occupancy
because he had not yet finished landscaping.  *Id.* at ¶ 95.  Likewise, Plaintiff testified in May 2015 at his first
examination under oath for Great Northern that he did not have a certificate of occupancy for 12 Inverness
when he obtained insurance.  *Id.* at ¶ 174.  In errata pages that he provided after the examination, Plaintiff
changed this testimony to state that he did, in fact, have a certificate of occupancy.  *Id.* at ¶ 175.  As far as the
Court is aware, no such certificate of occupancy for 12 Inverness was produced over the course of this
litigation.  In his Responses to Defendants' Joint Statement of Material Facts, Plaintiff notes that he always
had a certificate of occupancy for the original ranch home located at 12 Inverness—which burned down in
2006—implying that it was this original certificate of occupancy which formed the basis for his various
assertions that he was, in fact, in possession of a certificate of occupancy for 12 Inverness.  *See id.* at ¶ 94.

that Plaintiff was going to be away in Jamaica for the next two or three weeks, Mr. Signorelli told

Plaintiff that he should be on the lookout for someone from Great Northern to contact him about

this inspection. *Id.* at ¶ 114. Plaintiff provided a check for the premium on his Great Northern

policy, which was later returned from the bank for insufficient funds. *Id.* at ¶ 118. Plaintiff never

paid the premium on the Great Northern policy. *Id.*

On December 5, 2014, Plaintiff called GEICO from Jamaica in order to verify that his AIG

policy was active, and asked GEICO to change the effective date of the policy to December 7, 2014.

*Id.* at ¶¶ 126, 132. Although this request was granted, there was a delay while the change was being

approved, during which time Plaintiff called GEICO from Jamaica three additional times—on

December 8, 15, and 18, 2014—to check whether the effective date change had been accomplished.

*Id.* at ¶¶ 129-32. Eventually, the AIG policy was reissued with Plaintiff's requested inception date of

December 7, 2014, and a new policy number of 0021164966. *Id.* at ¶¶ 126, 131. As had occurred

with the Great Northern policy, the check Plaintiff later submitted to AIG on January 26, 2015 for

the policy premium was returned for insufficient funds. *Id.* at ¶ 133.

The Great Northern and AIG policies issued to Plaintiff each contain analogous provisions

regarding circumstances in which coverage may be disclaimed, as well as dictating the duties of the

insured in the process of making a claim. *See id.* at ¶¶ 85-86, 327-28. The Great Northern policy

states, in pertinent part:

> **Concealment or fraud**
> We do not provide coverage if you or any covered person has intentionally concealed
> or misrepresented any material fact relating to this policy before or after a loss. This
> condition does not apply to Vehicle Liability Coverage.
>
> . . .
>
> **Your duties after a loss**
> If you have a loss this policy may cover, you must perform these duties:
>
> . . .

8

**Prepare an inventory**. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and the actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

. . .

**Examination under oath**. We have the right to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

**Proof of loss**. You must submit to us, within 60 days after we request, your signed, sworn proof of loss which documents, to the best of your knowledge and belief:
- the time and cause of loss;
- interest of the insured and all others in the property involved and all liens on the property;
- other insurance which may cover the loss;
- changes in title or occupancy of the property during the term of the policy;
- specifications of any damaged buildings and estimates for their repair;
- receipts for additional living expenses incurred and records supporting any fair rental value loss; and
- evidence or affidavit supporting a claim under the Credit Cards, Bank Cards, Fund Transfer Cards, Forgery and Counterfeit Money Coverage, stating the amount and cause of loss.

*Id.* at ¶¶ 85, 327; Freed Decl., Ex. 124 at Y1, Y5. Likewise, the relevant portions of the AIG policy

are as follows:

B. Your Duties After a Loss

In the event of an **occurrence** which is likely to involve this policy, or if you or any other **insured person** under this policy is sued in connection with an **occurrence** which may be covered under this policy, you or an **insured person** must:

. . .

5. Provide us with bills, receipts and related documents.

6. As often as we reasonably require:
   a. Show the damaged property;

      b.   Provide us with records and documents we request; and
      c.   Submit to separate examination under oath.

   . . .

   10. Assist and cooperate with us in the conduct of the defense by helping us . . .
      (d) to secure and give evidence.

   . . .

G.  Concealment or Fraud

The entire policy will be void if, whether before or after a loss, you or an **insured person** have:

1.  Intentionally concealed or misrepresented any material fact or circumstances;
2.  Engaged in fraudulent conduct; or
3.  Made false statements;

relating to this insurance.

56.1 Stmt. at ¶¶ 86, 328; Freed Decl., Ex. 125 at AIG000019-20.

### c.  January 1, 2015 Fire at 12 Inverness

Less than a month after the two homeowner's insurance policies became effective, 12 Inverness caught fire during the early morning hours of January 1, 2015. 56.1 Stmt. at ¶¶ 69, 74. By the time firefighters arrived on the scene, the structure was fully engulfed in flames and burning so hot that the firefighters feared the two adjacent homes would catch fire. *Id.* at ¶ 69. After the fire, only one room in the house remained—a bedroom protected by the remnants of sheetrock walls. *Id.* at ¶¶ 165-66. During the ensuing investigation, empty gasoline cans were discovered in that bedroom and fire department canines "hit" on flammable liquids in several locations of the burned-out structure. *Id.* at ¶¶ 70-72. Lab testing confirmed the presence of ignitable liquids in at least three locations, and fire department investigators issued a report which determined that the fire had been incendiary in origin. *Id.* at ¶¶ 73-74. At his deposition, Yonkers Fire Investigator Frank

Phillips testified that during the ensuing investigation, the fire investigators saw evidence of

sheetrock in only one bedroom of the house. *Id.* at ¶¶ 165-66.

At the time of the fire, Plaintiff was abroad in Jamaica. *Id.* at ¶ 68. Upon his return to New

York several days later, he was interviewed by Yonkers Police Detective Scott Griffith. *Id.* at ¶ 76.

Detective Griffith later recounted that this interview "raise[d] the hairs up on [his] neck as to what's

going on here," and explained that Plaintiff's refusal to engage in any further interviews or to

otherwise cooperate with the investigation made Plaintiff a "person of interest." *Id.* at ¶¶ 77-79.

Detective Griffith testified that his suspicions were further aroused when he was contacted by

insurance company investigators and learned that, at the time of the fire, Plaintiff held two different

homeowner's insurance policies on 12 Inverness. Freed Decl., Ex. 49 at 51:11-24.

### d. Plaintiff's Homeowner's Insurance Claims

Following the fire, Plaintiff hired a public adjuster to help him in submitting his insurance

claims. 56.1 Stmt. at ¶ 207. With the adjuster's assistance, Plaintiff submitted a signed "Sworn

Statement in Proof of Loss" to Great Northern, which sought payment in the amount of $2,000,000

for the dwelling, $1,000,000 for the contents of the dwelling, and $500,000 for "other structure."

Freed Decl., Ex. 113. Plaintiff also submitted a Sworn Statement in Proof of Loss to AIG, which

sought payment in the amount of $2,500,000 for the dwelling, $1,250,000 for the contents of the

dwelling, and $500,000 for "other structure." *Id.* at Ex. 114. At some later point—although the

exact dates are not clear from the record[10]—Plaintiff submitted identical "contents reports" to both

Great Northern and AIG, detailing the property Plaintiff claimed had been present in 12 Inverness

---

[10] The parties claim in their Rule 56.1 statements that this itemized list was provided to Great Northern on
March 15, 2015. 56.1 Stmt. at ¶ 214. However, the document itself is signed and dated December 22, 2015.
Freed Decl., Ex. 113 at GNIC_0030860. Furthermore, as all parties admit, Plaintiff requested during his first
Great Northern EUO on May 19, 2015 that he be granted a waiver relieving him of the obligation to submit a
detailed contents list. 56.1 Stmt. at ¶ 213. Furthermore, during Plaintiff's third Great Northern EUO on
January 8, 2016, Great Northern's counsel specifically referenced an itemized contents list, which had been
provided to Great Northern by Plaintiff "a couple of weeks ago." Freed Decl., Ex. 28 at 759:22-23.

at the time of the fire. Freed Decl., Ex. 113 at GNIC_0030860, Ex. 126. The items listed in this
contents report include, among other things: over $200,000 in jewelry; $50,000 in gym equipment; a
$40,000 grand piano; $275,000 of painting and artwork; around $500,000 of appliances and
furnishings; $55,000 of clothing; and roughly $50,000 of tools and equipment. *Id.*

On January 15, 2015, Plaintiff gave a recorded statement to Great Northern representative
and investigator Fred White. *See* 56.1 Stmt. at ¶¶ 89, 95, 135, 138. During that interview, Plaintiff
told Mr. White that "he had done nothing to have the AIG policy put in force on 12 Inverness," and
that "after he was told that GEICO would obtain a quote from one of their companies that
underwrites 'high end homes,' there were no further conversations with GEICO." *Id.* at ¶ 138.

On February 18, 2015, AIG noticed Plaintiff of its intent to take his Examination Under
Oath ("EUO"), as required by his homeowner's insurance policy. Freed Decl., Ex. 53. Great
Northern provided a similar notice to Plaintiff on February 23, 2015. *Id.* at Ex. 54. AIG's EUOs of
Plaintiff eventually occurred on June 24, 2015, January 6, 2016, and March 10, 2016. Freed Decl.,
Exs. 63, 64, 64A. Great Northern's EUOs took place on May 19, 2015, December 10, 2015, January
8, 2016, and May 19, 2016. *Id.* at Exs. 37, 66, 28, 67. At the conclusion of each EUO, Plaintiff
submitted lengthy errata sheets, which in the aggregate totaled over 400 pages of corrections to his
EUO testimony. 56.1 Stmt. at ¶ 390.

### e. The May and June 2015 EUOs

Plaintiff's first Great Northern and AIG EUOs took place on May 19, 2015 and June 24,
2015, respectively. Much of the questioning at those EUOs related to Plaintiff's sources of income
and financial status. For instance, Plaintiff testified during his Great Northern EUO that he did not
earn any income in 2014 but had made approximately $200,000 to date in 2015. *Id.* at ¶ 340. He
referred to all the contents of the house—which he valued at over $1,000,000—as "his property."
*Id.* at ¶ 215. He also told the Great Northern examiner that he had not filed tax returns since 2010.

12

*Id.* at ¶ 334.  At the AIG EUO, Plaintiff testified somewhat conflictingly that he did not know when he stopped filing tax returns and could not recall his income.  *Id.* at ¶ 343.

During his Great Northern EUO, Plaintiff also testified that he did not realize that he had purchased a policy from AIG until after the fire at 12 Inverness, that at the time he learned about the fire, he believed that he did not have *any* insurance on the home, and that he could not recall having any conversations with GEICO about changing the inception date of the AIG policy.  *Id.* at ¶¶ 135, 141-42.  He similarly testified to AIG that he never accepted a quote for insurance from GEICO, that he never paid any deposit, and that he never did anything affirmatively to open the AIG policy.  *Id.* at ¶ 145.

When asked about the condition of 12 Inverness at the time of the fire, Plaintiff testified during his AIG EOU that the house was "95-98% finished" and that "the house was complete."[11] *Id.* at ¶ 176.  Plaintiff was also asked multiple times whether the walls were covered with sheetrock, though he repeatedly avoided answering that question.[12]  *Id.* at ¶ 183.

---

[11]  Notably though, Richard Flynn, the ADT employee who installed the central station alarm system in 12 Inverness on November 26, 2014—just over a month before the fire—provided a much different perspective on the state of the house.  *See* Freed Decl., Ex. 41 at 26:5-31:7, 71:10-16, 76:17-23, 79:21-80:23.  Flynn testified at his deposition that the house was "[u]nfinished" and "a skeleton inside," explaining that "electrical wires [were] hanging left and right. . . .  [W]hen you went in, it was a frame, [but] there were no walls. . . . You couldn't tell where a doorway was versus going through a beam."  *Id.* at 26:5-21.  However, Plaintiff vigorously disputes the veracity of Flynn's testimony, pointing to deposition testimony from his friend, business partner, and part-time chauffeur Arky Cabral, as well as his bankruptcy attorney Kim D'Souza.  *See* 56.1 Stmt. at ¶¶ 158-64.  Cabral testified that the home was "complete" when he visited it in the summer of 2014, and that it had walls and "a lot of different rooms."  Declaration of Jason M. Cieri, Dkt. No. 94 ("Cieri Decl."), Ex. 146 at 51:12-52:17, 54:10-15.  By contrast, D'Souza does not appear to have directly spoken to the condition of 12 Inverness's interior in the portions of his deposition referenced by Plaintiff.  Rather, he merely discusses various items he saw in the home during his visit.  *Id.*, Ex. 147 at 240:11-242:23, 248:2-249:23.

[12]  As an example, below is one excerpt of Plaintiff's testimony on this point:

Q.  Well, just so we understand each other, when you say the house was finished before the fire, can we agree what finished means?  I mean were all the walls [s]heetrocked?

A.  I'll go with the Building Department in terms of finished.  All my inspections was up to date and the only inspection I needed was the final inspection to get a CFO.  I'll go with that terminology.  I'll consider that finished.

Plaintiff also told the Great Northern examiner that—despite his minimal background in science or engineering—he had invented a device known as "El Hydro," which uses hydrogen, extracted from water, to greatly increase the efficiency of internal combustion engines. *Id.* at ¶ 356. He claimed that he had received two patents for this device from the United States Patent & Trademark Office, that the value of his invention was "unlimited," and that the "prototype" for his invention was inside 12 Inverness at the time of the fire. *Id.* At the time of the first EUOs, Plaintiff refused to answer questions about "El Hydro," insisting that all information about his invention was "proprietary." *Id.* at ¶ 357.

   **f.   The December 2015 and January 2016 EUOs**

The second and third Great Northern EUOs were held on December 10, 2015 and January 8, 2016. Freed Decl., Exs. 66, 28. The second AIG EUO was held on January 6, 2016. *Id.* at Ex. 64.

During the second Great Northern EUO, Plaintiff reiterated his previous claim that he did not know that he had a homeowner's insurance policy from AIG until after the fire. 56.1 Stmt. at

---

. . .

Q.  Well, I just want to understand what the house looked like when it went up in flames.

A.  To be honest with you, I do not know what it looked like because I wasn't there.

Q.  Well, you were there presumably before you left for Jamaica?

A.  Presumably.

Q.  Right. So before you left for Jamaica, were all the rooms in the home [s]heetrocked?

A.  What do you think?

Q.  I'm asking you.

A.  The house was completed.

Freed Decl., Ex. 63 at 134:12-135:15.

¶ 136.  He explained that his large jewelry claim was the result of his "investments" in precious

metals, diamonds, and luxury watches.  *Id.* at ¶ 220.  He also claimed that in July 2015 he had signed

a $300 million contract to deliver El Hydro to a company in the Dominican Republic.  *Id.* at ¶ 332.

Under the contract, Plaintiff was allegedly entitled to $5 million immediately upon signing and an

additional $15 million five months later when he began marketing the product in the Dominican

Republic.  *Id.*

During this EUO, when pushed for information that would corroborate his income and

finances at the time of his loss, Plaintiff refused to provide details, as demonstrated by the following

exchange:

> Q.  It's important to see your financial condition at the time of the loss, and how
> you're making money.

> A.  Are you questioning my financial condition?

> Q.  I am.

> A.  You better – you better got proof, because you did that with Bank of New York,
> and you see how it turned out.

> Q.  Not questioning – you're misunderstanding. The insurance company is allowed
> to see –

> A.  The insurance company sold me insurance.  Don't come now, ask me if I had –
> you should have asked me if I had money then.  You didn't.  I go back to my answer.
> Your employer should have made making money over the preceding years
> prerequisite to selling me insurance.  Move on.

> Q.  Mr. Scott –

> A.  Move on.

*Id.* at ¶ 339.

During the second AIG EUO—which took place on January 6, 2015—Plaintiff again

referred to the personal property that was the subject of the Great Northern and AIG claims as his

property. *See id.* at ¶ 215. In particular, he referred to the "side round brilliant cut 1.00ct Color Blue" diamond listed as Item 21 on his contents report as "his stone," and claimed to have acquired it in 2008. *Id.* at ¶¶ 225, 226, 229. With respect to Item 38, a Rolex watch valued by Plaintiff at $48,500, Plaintiff testified that he purchased it in 2012. *Id.* at ¶ 230. He stated that he purchased the grand piano listed in his contents sheet in 2006 or 2007. *Id.* at ¶ 239. In discussing the 101 tools which were listed on his contents report, Plaintiff testified that he is "a tool collector" and he buys "every piece of tools there is," saying "I'm known for that." *Id.* at ¶ 257. Plaintiff testified the tools were purchased over a ten to fifteen-year period,[13] and that he had collected them for a planned tool rental business. *Id.* at ¶¶ 258, 259. Plaintiff also claimed that he had personally acquired the $275,000 worth of art which was included in his contents report "over a ten-year period." *Id.* at ¶ 273.

During the second AIG EUO, Plaintiff was questioned for the first time about the discrepancies between the $13,000 of personal property he had listed in his 2013 bankruptcy filings and the over $1 million worth of personal property he listed in his 2015 insurance claims. *Id.* at ¶¶ 295-97. When confronted, Plaintiff testified as follows:

Q. Did you so declare under the penalty of perjury when you submitted this document to the United States Bankruptcy Court?

A. Why is this relevant?

Q. You will see the relevance as we go on.

A. No, you are going to tell me the relevance now. You don't go on a fishing expedition without first figuring out where you are going to take it.

Q. Mr. Scott, this is not a fishing expedition.

A. Tell me why this is important?

---

[13] However, Plaintiff changed that response to five years in his errata sheet. 56.1 Stmt. at ¶ 258.

Q.  This is an examination.

A.  This is my bankruptcy.  You are not objecting to anything that's in here, right, you would have to take it up with the bankruptcy court.

. . .

Q.  There are many statements about assets and liabilities that are made that are relevant and material to an evaluation of the claim and frankly to an evaluation of the testimony that you have given here under oath today.

A.  Okay, so I corrected my whatever misrepresentation you think you may have. My assets was owned after my bankruptcy, does that fix the problem if I have any?

Freed Decl., Ex. 64 at 141:15-143:16.

After the AIG examiner explained to Plaintiff that the purpose of the questioning was to determine how he had amassed enough cash to acquire $1.3 million in personal property from the date of his bankruptcy to the date of the fire, Plaintiff testified:  "I'm going to stipulate to the whole document [the August 22, 2013 Chapter 7 bankruptcy petition] and now we can move on. . . . I'm stipulating to the whole document."  56.1 Stmt. at ¶ 298.  However, when the examiner began to question Plaintiff about specific items on the bankruptcy schedules, Plaintiff refused to answer the examiner's questions:

Q.  But if it were true that you had no cash on hand and virtually no assets on August 20th of 2013 it is certainly relevant to inquire as to how you could have accumulated $1.3 million in personal property as of the date that you left for Jamaica?

A.  Okay, so I guess that's a big question.

Q.  That's—

A.  So close your book, deny the claim and let's go.

Q.  We are entitled to—

A. No, close your book, deny the claim, and let's go. We ain't got no time for this foolishness.

*Id.* at ¶ 351.

Although he had initially testified that all of the property in 12 Inverness belonged to him and that some of it—such as the grand piano and the paintings and artwork—had been acquired as early as a decade prior, after being confronted with his bankruptcy filings and warned that a failure to answer questions about them could constitute a failure to cooperate under the policy, Plaintiff explained that the property "was gifted to [him] after [his] bankruptcy, so that's how [it] w[as] [his]." *Id.* at ¶¶ 295-300. For instance, when he was presented with certain discrepancies regarding the value of his art collection, he explained:

Q. So on August 20th of 2013 you represented to the United States Bankruptcy Court that you had no art of any value yet today you testified about a contents claim in which you have accumulated $275,000 of art over a period of time, which is true, what you told the United States Bankruptcy Court or what you told us here today?

A. They are both true.

Q. How could they both be true?

A. There you go, the contents in terms of painting, et cetera, et cetera belong to another party it was gifted to me after my bankruptcy so that's how they are mine.

Q. Who gifted it to you?

A. You don't need to know.

*Id.* at ¶ 383.

Plaintiff also evaded AIG's questions about his accumulation of more than $200,000 in diamonds and luxury watches in the thirteen months following his bankruptcy filing:

Q. You represented to the bankruptcy court that you had no jewelry, yet earlier today you testified that you had hundreds of thousands of dollars worth of jewelry.

A. What you see there is a fact and I do have jewelry so what's the problem, what's the issue?

18

Q.  Well, the issue is if you had no jewelry when you filed for bankruptcy –

A.  Hey, it's two years later, things happened.

*Id.* at ¶ 228.  In his errata sheet, Plaintiff corrected his answer to this question to read, "I represented

that I did not own, not that I possessed no jewelry.  *Id.* at ¶ 232.

Plaintiff also claimed that the tools he included in his contents report were given to

him after his bankruptcy.

Q.  So when you represented to the United States Bankruptcy Court in paragraph
thirty five that you had basic hand tools and lawn equipment worth $1,600 was that
true?

A.  Well at the time my hand tools was that, I didn't know I was going to get such a
gift after my bankruptcy

Q.  I'm just asking the question, who gifted it to you?

A.  I don't recall.

*Id.* at ¶ 384; *see also id.* at ¶ 261.  In his errata, Plaintiff claimed the tools were purchased for a friend,

Bevon Spence.  *Id.* at ¶ 262.

During the third Great Northern EUO—which took place on January 8, 2015, two

days after the second AIG EUO—Plaintiff continued to assert that the personal property

listed in his contents sheet was his personal property, given to him after his bankruptcy.  *See,*

*e.g.*, *id.* at ¶¶ 215-16, 300.  For instance, regarding the jewelry, he testified:

Q.  You said a while ago that you were holding some jewelry items for somebody
else.  Which jewelry items were you holding for someone else; anything on this list?

A.  It don't really matter.

Q.  It does matter.

A.  No, because it was all my content.

Q.  Who did—

A. They were all my content.  They were mine.  They were gifted to me.

Q. Who were you holding them for?  Who were you holding them for?

A. It don't matter.  It's my gift.

. . .

Q. Where did you get Item Number 21?

A. Item Number 21, I don't recall.

Q. Where did you get Item Number 22?

A. You mean where—the point of the original purchase?

Q. Did you buy it?  Was it a gift?  Did you find it in the street?  Where did you get Item 22?

A. I guess all of the above.

Q. It can't be all of the above.

A. It can be.

*Id.* at ¶¶ 303, 366.  Plaintiff also testified that the artwork which was included his claim was given to him after his bankruptcy.[14]  *Id.* at ¶ 302.

When asked about his net worth after his bankruptcy, Plaintiff told the examiner, "[g]ood.  I'm a little bit over half-a-billion dollars.  Please, woman.  My invention alone, I don't have time to stop."  *Id.* at ¶ 331.  Plaintiff repeated his claim regarding the $300 million contract for "El Hydro" and testified that he had access to $1.7 million at the time the fire occurred.  *Id.* at ¶¶ 332, 341.  However, when pushed to provide proof of those assets, Plaintiff testified as follows:

Q. What have you shown me in assets?

---

[14] In his errata sheet for the third Great Northern EUO, Plaintiff also added that the artwork may have included "a Picasso."  56.1 Stmt. at ¶¶ 269-70.

A. I don't know. Your husband probably lives miserably. I don't know how one pleases you. Just can't.

. . .

Q. How can we verify your financial condition? Just tell me. The floor is yours. How can we verify your financial condition?

A. Well, we'll see during the course of our doing litigation how we'll go about this. We'll go back to one other request you had made from—made of me about—

Q. I'd like to stay on topic. I'd like you to answer the question.

A. I'm done with the topic.

. . .

Q. Other than you saying so, and we hear you saying so, how can we verify what you're saying?

A. Don't verify. As long as it's contingent on whether you deny me or whatever, go ahead.

Q. We're not denying your claim. We're trying to understand your financial condition.

A. Then why does it matter? My financial condition is intact. Trust me.

Q. How can we verify that?

A. You really don't want to go down that road with me.

*Id.* at ¶ 342; Freed Decl., Ex. 28 at 668:16-25.

During his third Great Northern EUO, Plaintiff once again gave conflicting and evasive testimony regarding the condition of 12 Inverness before the fire. He first testified that only two rooms at 12 Inverness were furnished at the time of the fire—a guest room and his bedroom, but then changed his testimony in his errata sheet to say that the entire home was furnished and "was not unfinished." 56.1 Stmt. at ¶¶ 168-69. When asked to detail the specific renovations or changes that had occurred at 12 Inverness between the September 2013 appraisal and the date of the fire,

Plaintiff said he "ha[d] no recollection" of what exactly had been done, but that anyone who entered the home could "attest it was complete." *Id.* at ¶¶ 170-71.

### g.  Plaintiff's February 2016 Amended Bankruptcy Filings

On February 23, 2016—approximately a month and a half after he was first questioned about the discrepancies between his bankruptcy filings and his insurance claim, and two years after he received a discharge from the bankruptcy court—Plaintiff, through his attorney Kim D'Souza, submitted additional amended filings to the bankruptcy court in connection with his August 2013 bankruptcy. *Id.* at ¶ 304.  Mr. D'Souza acknowledged at his deposition that the impetus behind these amended filings was his discovery of the discrepancies between Plaintiff's bankruptcy filings and the contents insurance claim. *Id.* at ¶ 305.  The amended bankruptcy filing—which Plaintiff again swore to under penalty of perjury—indicated that the over $1 million in personal property detailed in Plaintiff's insurance claims, rather than belonging to Plaintiff, belonged to others, and had been entrusted to Plaintiff's "care, custody and control" at the time of the fire. *Id.* at ¶¶ 307, 309.[15] Although Plaintiff had previously sworn in his 2013 bankruptcy filings that he was not in possession of any property belonging to others, this answer was also amended to identify various third-party individuals and entities who had allegedly entrusted Plaintiff with their property. *Id.* at ¶¶ 309, 314.

### h.  The May 2016 EUOs

During his fourth and final Great Northern EUO on May 19, 2016, Plaintiff reiterated the statements he had made in his amended bankruptcy filing, claiming that the personal property which was the subject of his insurance claims was the property of others, and had been entrusted to his "care, custody and control" at the time of the fire. *Id.* at ¶ 307.  He also attempted to explain

---

[15]  This amendment also changed Plaintiff's income from zero to $15,581.00 per month. 56.1 Stmt. at ¶ 313. Mr. D'Souza testified that this number was not derived from a tax document such as a 1099 or W-2, but rather the number was simply provided to him by Plaintiff. *Id.*

discrepancies in the evidence regarding the presence of sheetrock in 12 Inverness by asserting for the first time in his errata sheet that "[t]he house was built with the open concept style that involved minimizing hallways, rooms that flow into one another, design[ed] for long lines of site [sic]," and which employed "columns rather than full walls." *See id.* at ¶¶ 172, 396.

Additionally, Plaintiff used his errata sheets for the fourth Great Northern EUO to direct personal comments towards the Great Northern EUO examiner, including notes such as:

> I was not confused. I knew you were entering false information on the record. I knew you were asking questions so as to elicit out of context responses that gave a false impression.

> You live completely in your arrogant mind, but I live in the real world.

> Ms. Bernstiel, I've admonished you about breaking the commandments, and bearing false witness, and now you are asking me to make up a story. There are no stories here, do you understand, you and I, well we are both under obligation to put truth into the record. I take that opportunity seriously, and you want to make up stories. Do you have a child? Why don't you read him/her some child book stories, and leave that kind of activity at home where it belongs?

> You think like a street punk. A criminal. You should not be a member of the bar.

> You are the very picture of the sleazy, dishonest attorney that the public thinks of when they despise the profession.

*Id.* at ¶ 398.

During his final AIG EUO—which took place on May 23, 2016—Plaintiff refused to answer any questions about the ownership of the jewelry which was included in his claim, asserting that the answer to that question was "proprietary stuff." *Id.* at ¶ 233. During this EUO, Plaintiff was also questioned regarding how no remnants of the cast iron components in the grand piano survived the fire. *Id.* at ¶ 243. Plaintiff addressed this question in his errata sheets:

> Yes, the piano has cast iron constituents that should be there, but don't forget that Genovese crime family associate Andrew McGuire had stripped the house of all the metal within twenty four hours of the fire. Didn't the building department inform you of that? Oh sorry, the building department, acting with exceptional speed, and without hesitation, selected Andrew McGuire, who had been indicted by the US Government for Racketeering

23

to do the knock down. These people selected Andrew McGuire - these guys are the one gave that file with the missing 2005 C/O and the other missing sign-offs.

*Id.*

### i. Plaintiff's June 2016 Bankruptcy and the Related Adversary Proceeding

In June 2016, the Mortgagee Bank filed another notice of foreclosure sale, scheduling an auction of 12 Inverness for July 22, 2016. *Id.* at ¶ 59. On July 20, 2016, Plaintiff filed a third bankruptcy case in the United States Bankruptcy Court for the Southern District of New York, again staying the sale of 12 Inverness. *Id.* at ¶¶ 60-61. On December 28, 2016, Plaintiff commenced an adversary proceeding in the bankruptcy court against Great Northern and AIG, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing in connection with Defendants' failure to pay his claims resulting from the January 2015 fire. Dkt. No. 1-1. After the adversary proceeding was filed, Great Northern moved on February 23, 2017 for withdrawal of the reference from the Bankruptcy Court to this Court pursuant to 28 U.S.C. § 157(d). Dkt. No. 1. The Court granted that motion on April 17, 2017. Dkt. No. 16.

On June 21, 2018, Judge Alison J. Nathan of the Southern District of New York entered an order affirming the bankruptcy court's findings of fact and conclusions of law, denying Plaintiff's request for a declaratory judgment that the mortgage on 12 Inverness had been paid in full and denying Plaintiff's demand that the 2009 judgment of foreclosure and sale be voided. 56.1 Stmt. at ¶ 62. On July 31, 2018, Defendants moved for summary judgment in this case, asserting that the homeowner's insurance policies underlying Plaintiff's breach of contract claim were voided as a result of Plaintiff's breach of the "concealment or fraud" and "cooperation" provisions contained in the policies. Dkt. No. 84. On November 26, 2018, Judge Cecelia G. Morris of the United States Bankruptcy Court for the Southern District of New York entered an order dismissing Plaintiff's bankruptcy case. Dkt. No. 106.

24

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted),

25

and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed.
Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is
"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party
against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and
citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v.
Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City
Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the
court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility
and choices between conflicting versions of the events are matters for the jury, not for the court on
summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III. DISCUSSION

### A. Defendants are entitled to summary judgment because Plaintiff breached the "concealment or fraud" provisions of the policies.

Defendants argue that their motion for summary judgment on Plaintiff's claims for breach
of contract should be granted because Plaintiff's repeated, intentional false statements to both AIG
and Great Northern during the claim investigations violated the policies' "concealment or fraud
provisions" and therefore vitiated Plaintiff's coverage under the policies. Defendants point to four
categories of alleged lies, arguing that any one of these false statements should void the insurance
policies as a matter of law: (1) Plaintiff's assertions that he did not know he had obtained a
homeowner's insurance policy from AIG; (2) Plaintiff's claim that the construction and renovations
on 12 Inverness were complete; (3) Plaintiff's claim that 12 Inverness was filled with over $1 million
in personal property; (4) Plaintiff's statements regarding his financial condition at the time of the
fire. Defendants' motion for summary judgment based on Plaintiff's breach of the "concealment or
fraud" provisions is granted.

26

"To void a policy for concealment, misrepresentation, or fraud by the insured . . ., an insurer

must show that the statements in question were (1) false, (2) willfully made, and (3) material to the

insurer's investigation of the claim." *Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines

Co.*, No. 12-cv-6509 (CM), 2014 WL 406542, at *1 (S.D.N.Y. Jan. 30, 2014) (quoting *Fine v. Bellafonte

Underwriters Ins. Co.*, 758 F.2d 50, 52 (2d Cir. 1985)). "Where, as here, the policy contains a clause to

the effect that a claim is void if an insured intentionally conceals or misrepresents a material fact

concerning a claim under the policy, 'it is clear that good faith and fair dealing are the norms by

which proofs of loss are to be measured.'" *Admiral Indem. Co. v. Bouley Int'l Holding, LLC*, No. 02-cv-

9696 (HB), 2003 WL 22682273, at *4 (S.D.N.Y. Nov. 13, 2003) (quoting *Kaffalos, Inc. v. Excelsior Ins.

Co.*, 482 N.Y.S.2d 96, 98 (3rd Dep't 1984)) (internal alterations omitted). "The insurer must prove

fraud by clear and convincing evidence." *Id.* (quoting *Varda, Inc. v. Insurance Co. of N. Am.*, 45 F.3d

634, 639 (2d Cir. 1995)).

"Although 'actual intent' to defraud is rarely sufficiently proven to warrant summary

judgment, summary judgment may be granted where 'no reasonable trier of fact could infer anything

other than knowing intent to defraud,'" *D'Andrea v. Encompass Ins. Co. of Am.*, No. 15-cv-467 (MJR),

2018 WL 4095098, at *4 (W.D.N.Y. Aug. 28, 2018) (quoting *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp.

2d 300, 323 (S.D.N.Y. 2009)). Similarly, "[t]he question of materiality is typically one of fact for

resolution at trial, but 'where the evidence concerning the materiality is clear and substantially

uncontradicted, the matter is one of law for the court to determine.'" *Scottsdale Ins. Co. v. Priscilla

Properties, LLC*, 254 F. Supp. 3d 476, 482 (E.D.N.Y. 2017) (quoting *Chicago Ins. Co. v. Kreitzer &

Vogelman*, No. 97-cv-8619 (RWS), 2000 WL 16949, at *7 (S.D.N.Y. Jan. 10, 2000)).

Although the Court recognizes that the bar for granting summary judgment on the basis of

fraud is a high one—having sifted through the morass of conflicting and obfuscating statements

made by Plaintiff over the course of Defendants' investigations—the Court agrees that at least two

statements within the categories of Plaintiff's alleged lies identified by Defendants were, as a matter of law, false, willfully made, and material to the insurers' investigation of the claims. Those statements therefore voided Plaintiff's coverage under the policies. Those statements are, first, Plaintiff's claim that he was not aware at the time of the fire that AIG had issued a policy on 12 Inverness and, second, his various statements about the ownership and acquisition of the over $500,000 in jewelry, art, and tools which were included in the claims he submitted to Defendants.

First, Plaintiff repeatedly told both Great Northern and AIG that he was not aware that he had a homeowner's insurance policy through AIG. On January 15, 2015, Plaintiff told Great Northern investigator Fred White that "he had done *nothing* to have the AIG policy put in force on 12 Inverness." 56.1 Stmt. at ¶ 138 (emphasis added). He repeated his claim that he was unaware of the AIG policy at the time of the fire during his first Great Northern EUO on May 19, 2015. *Id.* at ¶¶ 135, 141-42. During his first AIG EUO on June 24, 2015, he again testified that he "never did anything affirmatively to open the AIG policy." *Id.* at ¶ 145.

The undisputed evidence in the record proves that these statements were false. Plaintiff contacted GEICO directly on October 30, 2014 and provided GEICO with information about his home. *Id.* at ¶ 119. After another conversation with Plaintiff, GEICO issued the AIG policy with an effective date of November 7, 2014. *Id.* at ¶ 123. Plaintiff admits that on December 5, 2014, he called GEICO from Jamaica in order to verify that his AIG policy was active, and that he asked GEICO to change the effective date of the policy to December 7, 2014. *Id.* at ¶¶ 126, 132. Plaintiff then called GEICO *three additional times* to confirm whether the effective date change had been completed. *Id.* at ¶¶ 129-32. Plaintiff's statements that he did nothing to open the AIG policy were thus clearly untrue, and Plaintiff does not argue that they were not. Instead, he claims that Defendants have failed to carry their burden of demonstrating that these statements were willfully

28

made and material to the investigation. That argument—which Plaintiff fails to support with any analysis of the record evidence—is wholly unpersuasive.

Barely a month after Plaintiff contacted GEICO *four separate times* to confirm that his AIG policy was active and to make changes to that policy, Plaintiff told Great Northern that he did not know he had an AIG policy and that he had done *nothing* to put it in effect. *Id.* at ¶ 138. He later repeated this identical claim to AIG. *Id.* at ¶ 145. Although the Court recognizes that it is not Plaintiff's burden to prove that his misrepresentation was unintentional, it is worth noting that Plaintiff has not claimed that he made this false statement as the result of a mistake or misunderstanding. Indeed, he has offered no explanation for this misrepresentation whatsoever. In such circumstances—where the evidence of a claimant's knowledge of facts which entirely undermine the statements he made to his insurer is undisputed—courts in this state have found, as a matter of law, that the claimant made those statements willfully and with intent to defraud. *See Rickert v. Travelers Ins. Co.*, 551 N.Y.S.2d 985, 986 (3rd Dep't 1990) (court granted summary judgment to insurer when insured failed to disclose past insurance claims at EUO, even when insured submitted an affidavit stating that his failure to disclose was the result of an imperfect recollection); *D'Andrea v. Encompass Ins. Co. of Am.*, No. 15-cv-467 (MJR), 2018 WL 4095098, at *2 (W.D.N.Y. Aug. 28, 2018) (willful misrepresentation was established as a matter of law when, after deeding the insured property to his son, claimant testified at EUO that no one else was on the deed); *see also Angevine v. State Farm Fire & Cas. Co.*, 189 F.3d 460 (2d Cir. 1999) (upholding district court's grant of summary judgment to insurer when insured had denied during EUO that he had used a specific alias at any time, even though he had previously used the name to hide assets from his wife). Here, the Court concludes that no reasonable jury could find that Plaintiff's statements regarding his lack of knowledge of the existence of the AIG policy and his failure to take any actions to obtain the AIG policy were not willfully made.

Finally, the Court concludes that Plaintiff's false statements were material as a matter of law. "Courts routinely find that information concerning an insured's credibility or motive is material where the insurer reasonably suspects arson or fraud in connection with the claim." *Eagley v. State Farm Ins. Co.*, No. 13-cv-6653, 2015 WL 5714402, at *10 (W.D.N.Y. Sept. 29, 2015) (citing *Harary v. Allstate Ins. Co.*, 988 F. Supp. 93, 104 (E.D.N.Y. 1997)). Plaintiff does not dispute that AIG and Great Northern had reason to believe—based on the conclusions of the Yonkers fire investigators—that the fire at 12 Inverness was the result of arson. 56.1 Stmt. at ¶¶ 73-74. Nor does he dispute that the acquisition of two policies would be a "red flag" regarding the insured's intent, particularly in a case of suspected arson. *See, e.g.*, Freed Decl., Ex. 55, at ¶ 7 (Declaration of Fred White). The Court therefore finds that Plaintiff's false statements regarding his knowledge of the AIG policy were false, willfully made, and material as a matter of law, and that Defendants are entitled to summary judgment based on these statements.

Second, the Court concludes that Plaintiff's conflicting statements about the ownership and acquisition of the over $500,000 in jewelry, art, and tools included in the claims he submitted to AIG and Great Northern were also, as a matter of law, false, willfully made, and material to Defendants' investigations. Plaintiff submitted a claim to both insurers for over $200,000 worth of jewelry, $275,000 of painting and artwork, and roughly $50,000 of tools and equipment. Freed Decl., Ex. 113 at GNIC_0030860, Ex. 126. During his initial EUOs, he repeatedly told Defendants that the property belonged to him, that he had "investments" in precious metals, diamonds, and luxury watches, that he was a "tool collector," who had purchased the tools included in his claim over an extended period stretching back at least five years, and that he had personally acquired the $275,000 worth of art which was included in his contents report "over a ten-year period." 56.1 Stmt. at ¶¶ 215, 220, 257, 275. He even provided AIG with specific dates—both of which predated his 2013 bankruptcy—on which he had acquired a $45,000 diamond and an almost $50,000 Rolex watch. *Id.*

at ¶¶ 229, 230. After being confronted with the discrepancies between these claims and his 2013 bankruptcy filings, Plaintiff told both insurers that the jewelry, art, and tools included in his claims were given to him after his bankruptcy. *Id.* at ¶¶ 302, 303, 383, 384. At his final Great Northern EUO, Plaintiff told Defendant that the personal property that was the subject of his claims actually belonged to other people, and had been entrusted to his "care, custody and control" at the time of the fire. *Id.* at ¶ 307.

 The Court need not determine *which* of Plaintiff's many statements regarding the ownership and acquisition of the jewelry, artwork and tools included in his claims were false, because it is clear—based on the blatantly contradictory statements he admittedly made—that at least some of the statements he made to each insurer were untrue. Furthermore, these detailed and antithetical statements undermine any possibility that the contradictions in Plaintiff's stories were the result of anything other than Plaintiff's willful disregard for the truth. *See Rickert v. Travelers Ins. Co.*, 551 N.Y.S.2d at 986; *D'Andrea v. Encompass Ins. Co. of Am.*, 2018 WL 4095098, at *2; *see also Nipkow & Kobelt, Inc., Parliament Textile Div. v. N. River Ins. Co.*, 673 F. Supp. 1185, 1188-89 (S.D.N.Y. 1987) (elaborate nature of falsehoods supports inference of fraud). And Plaintiff's statements about who owned the claimed property and when was acquired were clearly material as a matter of law. *See Carlin v. Crum & Forster Ins. Co.*, 595 N.Y.S.2d 420, 420-21 (1st Dep't 1993) ("It is well settled that questions as to ownership . . . and changes of interest in property are material as a matter of law."); *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 183 (2d Cir. 1984) ("[T]he materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding."). Accordingly, the Court concludes that Plaintiff's false, willful, and material statements regarding the ownership and acquisition of the jewelry, artwork, and tools included in his claim provide an independent basis to conclude that Plaintiff's breached the

"concealment or fraud" provisions of his contracts, and thus to grant summary judgment to Defendants.

**B. Alternatively, Defendants are entitled to summary judgment because Plaintiff breached the "cooperation" provisions of the policies.**

Defendants argue that they are also entitled to summary judgment on the alternative ground that Plaintiff breached the "cooperation" provisions contained within his homeowner's insurance policies. The Court agrees.

"Under New York law, it is well settled that the insured's cooperation is a condition precedent to coverage under an insurance policy and that summary judgment is appropriate where it is determined that an insured's conduct constitutes a breach of the policy's cooperation clause." *Stradford v. Zurich Ins. Co.*, No. 02-cv-3628, 2002 WL 31819215, at *4 (S.D.N.Y. Dec. 13, 2002). "In New York, the scope of the duty a cooperation clause establishes is prescribed by statute. New York courts have made it clear that this duty is a broad one: an insured's duty to cooperate 'is much broader than the right of discovery under the CPLR. By its terms the insured promises to render full and prompt assistance to discover the facts surrounding the loss and anything less results in a breach of contract.'" *Harary v. Allstate Ins. Co.*, 988 F. Supp. 93, 102 (E.D.N.Y. 1997), *aff'd*, 162 F.3d 1147 (2d Cir. 1998) (quoting *Dyno-Bite, Inc. v. Travelers Cos.*, 439 N.Y.S.2d 558, 560-61 (4th Dept. 1981)). "The insured's obligation to cooperate is not met by partial testimony or by promises of evidence to be supplied in some indefinite future." *Id.* (internal quotation marks omitted). "Under New York law, to deny insurance coverage on [the basis of a failure to cooperate], 'an insurance carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the insurer were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his or her cooperation was sought, was one of willful and avowed obstruction." *Wingates, LLC v. Commonwealth Ins. Co. of Am.*,

21 F. Supp. 3d 206, 217-18 (E.D.N.Y. 2014), *aff'd*, 626 F. App'x 316 (2d Cir. 2015) (quoting *Allstate Ins. Co. v. United Int'l Ins. Co.,* 792 N.Y.S.2d 549, 550-51 (2d Dep't 2005)).

A fire insurance claimant who is suspected of arson has a significant burden of cooperation. *Harary*, 988 F. Supp. at 102; *see also Eagley*, 2015 WL 5714402, at * 7 ("Cooperation provisions are construed broadly in the context of suspected arson." (internal alterations omitted)). "Under such circumstances, the insurer has the right to obtain 'all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims.'" *Eagley*, 2015 WL 5714402, at *6 (quoting *Richie's Corner, Inc. v. Nat'l Specialty Ins. Co.*, 598 F. Supp. 2d 274, 276 (E.D.N.Y. 2008)).

It is well established that the refusal to answer material questions during an EUO is a breach of an insured's duty to cooperate. *See, e.g., Eagley*, 2015 WL 5714402, at *8 ("A policyholder cannot satisfy his or her duty to cooperate, however, by attending an EUO but refusing to answer material questions."); *Harary,* 988 F. Supp. at 102 ("The insured's obligation to cooperate is not met by 'partial testimony.'"); *Allstate Ins. Co. v. Longwell,* 735 F. Supp. at 1195 (refusal to answer material questions at EUO barred recovery under the policy); *Country-Wide Ins. Co. v. Gotham Med., P.C.*, 20 N.Y.S.3d 861 (N.Y. Sup. Ct. 2015), *aff'd*, 63 N.Y.S.3d 349 (1st Dep't 2017) ("Dr. Scheer's failure to answer all relevant questions at the EUO, as required by the provisions of the applicable insurance policies, constitutes a material breach of contract, and precludes recovery by defendant.").

In cases of suspected arson, "it is well settled that questions regarding an insured's personal finances are material and relevant to the investigation." *Harary*, 988 F. Supp. at 101 (quoting *Ashline v. Genesee Patrons Cooperative Ins. Co.,* 638 N.Y.S.2d 217, 219 (3d Dept. 1996)). And, as previously noted, it is also well settled that in such circumstances, information concerning the insured's credibility or motive is material to the investigation. *Eagley*, 2015 WL 5714402, at * 10.

33

Here, it is undisputed that during multiple EUOs, Plaintiff repeatedly refused to answer questions regarding—among other things—his financial condition and his assets. When asked questions on these topics, he told the examiners to "move on," 56.1 Stmt. at ¶ 339; to "close your book, deny the claim, and let's go. We ain't got no time for this foolishness," *id.* at ¶ 351; "I'm done with the topic," *id.* at ¶ 342; and "You really don't want to go down that road with me." *Id.* During one of the EUOs, when asked to verify his assets, he launched a personal attack at the examiner, telling her "Your husband probably lives miserably. I don't know how one pleases you." *Id.* at ¶ 342. When asked how he acquired various assets, he consistently gave evasive and contradictory answers. *See, e.g., id.* at ¶ 366 ("Q. Did you buy it? Was it a gift? Did you find it in the street? Where did you get Item 22? A. I guess all of the above. Q. It can't be all of the above. A. It can be."). Given this undisputed testimony, the Court concludes that no reasonable jury could find that Plaintiff's refusal to answer these questions did not breach the cooperation clause in his policies. The Great Northern and AIG examiners repeatedly asked Plaintiff for information regarding his financial condition. That information was clearly material to the investigation of his claims, particularly because the insurers reasonably suspected that arson was the cause of the fire. And Plaintiff repeatedly and intentionally refused to answer the questions posed to him over the course of multiple EUOs, going so far as to even tell his examiners to go ahead and deny his claim. Under these undisputed circumstances, the Court concludes that Defendants are entitled to summary judgment on the alternative ground that Plaintiff has breached the cooperation provisions of his policies and is therefore not entitled to coverage under those policies.

**IV.    CONCLUSION**

For the reasons stated above, Defendants' joint motion for summary judgment is

GRANTED.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 84, to

enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:  September 30, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge